# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOMINIC MASCIOLA,

   Plaintiff,

   v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

   Defendant.

No. 12 CV 5738

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Dominic Masciola filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits and supplemental security insurance benefits pursuant to Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 216(i), 223(d), 1614(a)(3)(A). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and have filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d)(1).

# I. PROCEDURAL HISTORY

Masciola applied for Disability Insurance Benefits and Supplemental Security Income benefits on January 29, 2008, alleging that he became disabled on January 1, 2007, due to bipolar disorder and substance abuse disorder.[2] (R. at 78). The application was denied initially and on reconsideration, after which Masciola filed a timely request for a hearing. (*Id.* at 58-61, 90-96, 98). On November 17, 2009, Masciola, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 7-57). The ALJ also heard testimony from Courtney Boyda, Masciola's case manager at DuPage Pads, a "permanent supportive housing program" (*id.* at 37-48), and Linda Gels, a vocational expert ("VE") (*id.* at 48-55).

The ALJ denied Masciola's request for benefits on February 25, 2010. (R. at 65-73). The ALJ first found that Masciola met the insured status requirements of the Social Security Act through September 30, 2010. (*Id.* at 67). Applying the five-step sequential process, the ALJ then found, at step one, that Masciola had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date. (*Id.*). At step two, the ALJ found that Masciola's bipolar and substance abuse disorders were severe impairments. (*Id.*). At step three, the ALJ determined that Masciola does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (Id. at 67-69).

---

[2] Plaintiff states that he applied for benefits due to having bipolar disorder, and the Administrative Law Judge found that he has the severe impairments of bipolar disorder and substance abuse disorder. The Social Security Agency's Explanation of Benefits states that the application was based on claims of "bipolar depression, manic [*sic*], alcohol issues and violent tendencies," but because no party has addressed this discrepancy, the Court will not address it further. (R. at 78).

The ALJ then assessed Masciola's residual functional capacity (RFC) and determined that he has the RFC to perform "a full range of unskilled work at all the exertional levels subject to non-exertional limitations that the work . . . require performance of simple, repetitive tasks that requires no more than occasional contact with supervisors, co-workers, and the public." (R. at 69). At step four, the ALJ determined that Masciola is capable of performing past relevant work as a warehouse worker. (*Id*. at 71). Making an alternative finding at step five, based on Masciola's RFC, age, education, work experience and the VE's testimony, the ALJ used the Medical-Vocational Guidelines (the "Grid") to determine that there are jobs that exist in significant numbers in the national economy that Masciola can perform.[3] (*Id*. at 72). Accordingly, the ALJ concluded that Masciola was not suffering from a disability as defined by the SSA. (*Id*.).

The Appeals Council denied Masciola's request for review of the ALJ's decision on May 23, 2012. (R. at 1-6). Masciola now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

## II. SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the SSA, a claimant must establish that he

---

[3] The Grid reflects the Commissioner's determination that "certain combinations of age, education, work experience, and exertional limitations direct a finding of either disabled or not disabled at step five of the disability analysis." *Abbot v. Astrue*, 391 F. Appx. 554, 556 (7th Cir. 2010); *see Haynes v. Barnhart*, 416 F.3d 621, 627-28 (7th Cir. 2005); 20 C.F.R. pt. 404, subpt. P. app. 2.

or she is disabled within the meaning of the SSA.[4] *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, No. 06 C 0928, 2008 WL 687132, at *1 (S.D. Ill. March 10, 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[4] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## III. STANDARD OF REVIEW

Judicial review of the ALJ's final decision is authorized by §405(g) of the SSA. The court affirms the ALJ's decision if it is supported by substantial evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young*, 362 F.3d at 1001. Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.*

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. The court remands the case "where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. MEDICAL EVIDENCE

Masciola was first diagnosed with bipolar disorder in 2000, at approximately age 40. (R. at 272, 503). He began abusing alcohol at age 16, and cocaine at approximately age 20 or 25. (*Id.* at 503, 514). The record reflects a multitude of hospital admissions between 2003 and 2009 for detoxification following drinking binges (*Id.* at 636), for hearing voices telling him to overdose on his medications, suicidal thoughts and depression (*Id.* at 497-99, 464-468), and for depression (*Id.* at 512), prescription drug overdose and relapse with cocaine (*Id.* at 412-13); mania and depression with suicidal ideation (*Id.* at 708-12); and depression and suicidal ideation (*Id.* at 721-34).

Masciola also received long-term mental health care from the DuPage County Health Department, including visits with psychiatrists during 2007 and 2008, and prior to and following an admission to Glen Oaks Hospital in November 2007. (R. at 309-323, 342-349, 457-460, 540-559, 563-573, 736-748). Dr. Francisco Cruz, a psychiatrist, treated Masciola in March through July 2007, and diagnosed him with bipolar disorder and polysubstance dependence (some of the time noting the bipolar disorder as "hypermanic," and sometimes noting the substance abuse was in remission or partial remission). (*Id.* at 342-49). Masciola complained of "significant anxiety and occasional panic attacks," feeling "revved up," "problems with maintaining concentration," and that he had "trouble slowing down." (*Id.* at 343, 349).

In June 2007, Dr. Cruz assessed Masciola's anxiety as "sky high," and noted Masciola had been worrying a lot and not sleeping well. (R. at 344). Dr. Cruz also

noted that Masciola's speech rate was fast, and his agitation level was high, and adjusted his medications. (*Id.*). In July, Dr. Cruz again noted elevated agitation, a fast speech rate, and that Masciola reported feeling "hyper." (*Id.* at 343). Dr. Cruz prescribed multiple medications to manage these conditions, including Seroquel and Depakote, adjusting the dosages over time, and adding other medications as needed. (*Id.* at 342-49). Dr. Cruz noted that Masciola was living in the DuPage County Pads program[5] (*id.* at 349), was maintaining sobriety, and was attending Alcoholics Anonymous meetings (*id.* at 342-45). Masciola was working long days and sleeping very little. (*Id.* at 348-49).

On November 21, 2007, Masciola called an ambulance due to feelings of depression, helplessness, hopelessness, and worthlessness. (R. at 429). He was admitted to Glen Oaks Hospital, and Dr. Emad M. Amer assessed that Masciola was positive for anhedonia (inability to experience pleasure in normally pleasurable acts), isolation and feeling withdrawn. (*Id.*). He had a flat affect and was very depressed. (*Id.*). The doctor also noted Masciola's recent relapse with cocaine use (*id.* at 430) and diagnosed bipolar disorder with most recent episode of depression, and a GAF of 30 (*id.* at 430).[6] Dr. Emad also noted Masciola's history of suicide attempts, and current suicidal thoughts. (*Id.* at 435).

---

[5] The DuPagePads program provides temporary and permanent housing, along with support services, aimed at helping people become self-sufficient. <www.dupagepads.org/about/> (accessed July14, 2014).

[6] A GAF of 30 indicates that "**Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to**

Evaluating Masciola on November 30, 2007, psychiatrist Dr. Sanjeev Dwivedi wrote that Masciola reported having night sweats and nightmares and being unable to sleep well. (R. at 557-559). Masciola had also reported having racing thoughts. (*Id.*) Since his hospitalization, Masciola had not felt suicidal, but he did still talk to himself and felt paranoid and a lack of trust toward others. (*Id.*). Dr. Dwivedi assigned Masciola a GAF of 35, and diagnosed bipolar disorder, drug and alcohol abuse, and anti-social personality disorder. (*Id.* at 560). Dr. Dwivedi also assessed emotional lability and mania, and specifically concluded that Masciola could not locate work because of his mania and depression. (*Id.* at 458-60).

In Masciola's Annual Adult Clinical Evaluation on June 27, 2008, which Dr. Dwivedi conducted after treating Masciola for almost seven months, Dr. Dwivedi noted that Masciola was distractible and impulsive "persistently," that he had hallucinations "frequently," and that he had manic thoughts and behavior "frequently." (R. at 581). Dr. Dwivedi assessed Masciola with bipolar disorder with (1) recurrent depression, severe; (2) alcohol dependence; and (3) antisocial personality disorder. He also found Masciola to have a GAF of 35.[7] (*Id.* at 586).

---

**function in almost all areas** (e.g. stays in bed all day, no job, home or friends)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Rev. 2000) (hereinafter DSM-IV) (boldface in original).

[7] A GAF of 31-40 indicates "**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work . . . )." DSM-IV 34 (boldface in original).

Treating Masciola three days later, Dr. Dwivedi noted that Masciola was sad and anxious and reported still experiencing a lot of mood lability, although less mania that week. (R. at 589). Dr. Dwivedi changed Masciola's medications, and made a note to monitor for mania on one of the new medications. (*Id.* at 590). In July 2008, Dr. Dwivedi assessed Masciola again with a GAF of 35. (*Id.* at 98). In September 2008, Dr. Dwivedi noted that Masciola reported sleeping only a few hours a time due to racing thoughts and pain, and that Masciola had no craving for drugs or alcohol. (*Id.* at 597). His GAF remained the same, and Dr. Dwivedi adjusted the medications again. (*Id.* at 597-600).

Assessing Masciola again in January 2009, Dr. Cruz noted that while Masciola was still prescribed Depakote and Seroquel, he had not been taking them for 2½ months and was "not helpful like before" during his appointment. (R. at 741). During this appointment, Dr. Cruz noted that Masciola stated that he had not used cocaine in three months, and was not currently using alcohol. (*Id.*). Dr. Cruz reported that Masciola had "racing thoughts, bouts of agitation, irritability," and "feels revved up all the time." (*Id.*). Dr. Cruz diagnosed bipolar disorder I, polysubstance abuse—early remission, and generalized anxiety disorder, while ruling out ADHD. (*Id.*). He added Risperdal to Masciola's prescriptions, and made other adjustments to his medications. (*Id.*). The following month, Dr. Cruz noted that Masciola had responded well to the medication changes, was feeling "like a million dollars," and was not as restless or agitated. (*Id.*).

But in May 2009, Dr. Cruz noted that Masciola had run out of medication, was feeling "hopeless/overwhelmed," and was unable to sleep. (R. at 739). Dr. Cruz recorded an increase in agitation and irritability, and that Masciola's mind was "racing." (*Id.*). Dr. Cruz also wrote that Masciola "feels like giving up," although he denied suicidal ideation, plan or intent. (*Id.*). Dr. Cruz prescribed an increase in Risperdal, Ambien for sleep, and supportive care. (*Id.*).

Dr. Cruz did not see Masciola until August 2009, when Dr. Cruz again diagnosed bipolar disorder and polysubstance dependence, generalized anxiety disorder and personality disorder, not otherwise specified. (R. at 738). Dr. Cruz noted that Masciola was abusing prescription Vicodin and Valium, although not drinking alcohol ("maintaining sobriety"). (*Id.*). Dr. Cruz continued all medications. (*Id.*).

On October 13, 2009, Masciola walked to the emergency room at Edwards Hospital, reporting that he wanted to overdose on his medication or shoot himself because he could no longer tolerate the constant agitation, inability to sleep and pacing he had been experiencing for the previous two weeks. (R. at 708, 713). He stated that he had been compliant with his medications, although he had been started on new medication for gout recently. (*Id.* at 708). He was transferred to Linden Oaks Hospital for psychiatric care, where he reported panic attacks and anxiety for the previous two weeks. He admitted to using cocaine a few weeks prior, and to abusing Vicodin and Valium six months prior. (*Id.* at 710). Dr. Ahmari met with Masciola, and

assessed suicidality, finding a GAF of 20-30.[8] (*Id.* at 711). Dr. Ahmari changed Masciola's medications. (*Id.*) Masciola was discharged on October 19, 2009. (*Id.* at 726).

Masciola returned voluntarily to the Edwards Hospital emergency room on October 23, 2009, saying he had left too soon, had not taken his medication, and was suicidal (R. at 724-25). He stated he had slept approximately five hours in the previous five days, and that he had been suffering panic attacks for three days. He had been unable to fill his prescriptions due to limits with Access DuPage Healthcare. (*Id.* at 726).

On October 30, 2009, Dr. Cruz noted that Masciola reported to the clinic "extremely agitated, with marked difficulty sitting still/maintaining focus." (R. at 737). Masciola reported he had been hospitalized three times, "at Alexian Brothers/Linden Oaks for [illegible]/panic attacks." (*Id.*). Masciola reported being uncomfortable in his own skin and unable to sleep, experiencing racing thoughts, and constantly pacing the house. (*Id.*). He was refraining from using alcohol and illicit drugs. (*Id.*). Dr. Cruz adjusted Masciola's prescriptions, and made a note to consider adding another mood stabilizer. (*Id.*).

The following month, on November 13, 2009, Dr. Cruz noted again the recent hospitalization at Alexian Brothers, stating that Masciola did not recall what had

---

[8] A GAF of 21-30 is described at footnote 6. Here the physician assessed a GAF of 20, which signifies greater severity, and is encapsulated in the GAF category 11-20: "**Some danger of hurting self or others** (e.g. suicide attempts without clear expectation of death; frequently violent; manic excitement) **OR occasionally fails to maintain minimal personal hygiene** (e.g. smears feces) **OR gross impairment in communication** (e.g. largely incoherent or mute)." DSM-IV 34 (boldface in original).

happened and was not helpful in reporting information about it. (R at 737.).[9] Masciola had not slept in three nights, was agitated and had mood swings, was paranoid and "felt empty." (*Id*.). His then-current psychotropic medications were Risperdal and Ativan. (*Id*.). Dr. Cruz wrote in the "Plan" section of the medical notes to add lithium and Trazodone prescriptions, to continue the Risperal and Ativan, to "monitor [Masciola] closely," to "consider Elgin State Hospital," and to provide "supportive care." (*Id*.).

## V. DISCUSSION

Plaintiff raises six arguments in support of his request to reverse and remand: (1) the ALJ failed to analyze listings 12.04 and 12.09; (2) the ALJ erred in not reviewing the medical record in its entirety; (3) the ALJ failed to adequately review the evidence under 12.04(C); (4) the ALJ failed to properly consider all of plaintiff's work restrictions; (5) the ALJ erred in her credibility determination; and (6) the ALJ erred in her consideration of non-substantial gainful activity. (Pl. Mot. 4-14.) The Court addresses plaintiff's arguments in the course of the discussion below.

### A. The ALJ's Failure to Consider the Medical Record in its Entirety

In finding that Masciola does not have an impairment or combinations of impairments that meets or medically equals one of the listed impairments, the ALJ adopted the non-treating Disability Determination Services (DDS) psychological

---

[9] The physician notes reflect that Masciola was hospitalized three time in close succession in October/November 2009, just prior to the hearing date (R. at 737), and Masciola's case worker testified that he had been hospitalized at Alexian Brothers in October 2009, but there are medical records from only two hospitalizations in Fall 2009. (*Id*. at 702-34).

consultant's report in full. (R. at 68, 383-400). The ALJ stated that in coming to her conclusions, she considered all of the available evidence. As explained more fully below, however, the treating physicians' conclusions contradict the findings in the report by the DDS psychological consultant, Dr. Constance Fullilove. The ALJ did not explain why she rejected the treating physician's opinion in favor of the contradictory opinion by the DDS. She has provided no reason for discounting the treating physicians' opinions throughout her decision-making in step three and in considering Masciola's RFC, nor offered substantial record evidence for disregarding the treating physicians' opinions. For these reasons, her analysis is legally deficient.

### 1. The DDS Psychological Consultant's Assessment of Masciola

The DDS psychological consultant, Dr. Constance Fullilove, PhD., found that Masciola did not meet any impairment listing, and was able to work, although with certain limitations. (R. at 399). Dr. Fullilove wrote that Masciola "is somewhat limited in the area of sustained concentration and persistence by his bipolar disorder. Nonetheless, his functioning is adequate. He retains the mental capacity to perform at least SRT [(simple repetitive tasks)] on a sustained basis." (*Id.*). Dr. Fullilove was provided medical records from the DuPage County Health Department for October 2007 through February 2008, and records of a visit in September 2007 for a facial abcess. (*Id.* at 395). She concluded that Masciola has "myriad symptoms associated with bipolar disorder," a history of substance abuse, although he was in remission, and "adequate" functioning despite "mental impairments [that] are severe." (*Id.*). She found that his impairments were not of a listing level. (*Id.*).

In coming to this conclusion, Dr. Fullilove found that Masciola had only mild restrictions in his activities of daily living, moderate difficulties in social functioning and in maintaining concentration, persistence and pace. (R. at 393). In Masciola's Mental Residual Functional Capacity Assessment, Dr. Fullilove found Masciola "not significantly limited" in all "understanding and memory" categories, and in all "sustained concentration and persistence" categories except for one. She found Masciola moderately limited in the "ability to maintain attention and concentration for extended periods," and "ability to accept instructions and respond appropriately to criticism from supervisors," (*Id.* at 397-98). Dr. Fullilove found Masciola was otherwise "not significantly limited". (Id.)

### 2. *The Treating Physicians' Medical Assessments of Masciola*

Masciola's treating physicians' opinions paint a very different picture of his mental impairments. Dr. Dwivedi, a psychiatrist, treated Masciola for the longest period of any of the treating physicians, between November 2007 and September 2008. (R. at 317-24, 457-59, 557-603). At each treatment session, Dr. Dwivedi conducted a mental status exam, including descriptions of Masciola's speech, thought processes, associations, abnormal or psychotic thoughts, judgment, orientation, memory, attention span and concentration, language, fund of knowledge, mood and affect, motor behavior, and progress. He prescribed and adjusted medications, assigned a GAF, and assessed the need for ongoing treatment. Dr. Dwivedi also provided a narrative regarding Masciola's complaints, and provided accounts of Masciola's

treatment sessions which are consistent with the record. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

Dr. Dwivedi wrote in Masciola's Annual Adult Clinical Evaluation on June 27, 2008, after having had four treatment sessions with Masciola, that Masciola was distractible and impulsive "persistently," that he had hallucinations "frequently," and that he had manic thoughts and behavior "frequently." (R. at 581). These conclusions, provided in an evaluation conducted one month after Dr. Fullilove's, directly contradict Dr. Fullilove's conclusions, and yet the ALJ did not weigh the factors or explain why she disregarded Dr. Dwivedi's opinion in her Decision. Dr. Dwivedi found Masciola to have a GAF of 35 on multiple occasions, starting in 2007, including a treatment session one month after Dr. Fullilove's report, and through his September sessions with Masciola. (*Id*. at 586, 590, 595, 598). Dr. Dwivedi also assessed emotional lability and mania, and specifically concluded that Masciola cannot work because of his mania and depression. (*Id*. at 457-60). The ALJ did not address the GAF findings or the conclusion that Masciola could not work, nor did she explain why she disregarded these opinions in favor of the DDS psychologist's assessment that Masciola was functional.

Similarly, Dr. Cruz's medical notes, assessing and evaluating Masciola for the ten months prior to the hearing before the ALJ, provide a valuable look at Masciola's condition. Dr. Cruz, a psychiatrist, treated Masciola for five months in 2007,

and treated him again, regularly, from January through November 2009.[10] (R. at 342-49, 736-48). Dr. Cruz evaluated Masciola's mental state throughout those months, on a semi-regular basis,[11] and adjusted his medications as needed. Four days prior to the hearing in November 2009, Dr. Cruz prescribed lithium and indicated that hospitalization should be considered again, and that Masciola needed supportive care. (*Id*. at 736). Dr. Cruz's 2009 opinions were consistent with his earlier assessments of Masciola in 2007. (*Id*. at 349). His evaluations included a subjective symptom review, a review of medications and their side effects, a mental status exam, diagnoses and a review of the patient's condition overall, and a plan going forward. (*Id*. at 342-49, 736-48). Given the length of time Dr. Cruz treated Masciola, the thoroughness of the exams, the number of in-person treatment sessions, Dr. Cruz's specialty as a psychiatrist, and the consistency and supportability of his opinions, greater weight must be accorded to his opinions than those of the DDS consultant. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Like with Dr. Dwivedi's medical opinions, the ALJ does not address Dr. Cruz's opinions in her decision.

Additionally, Dr. Amer Emad treated Masciola during a hospitalization in November 2007 for suicidality, a drug overdose and anhedonia. (R. at 408-13, 429-30, 437-40, 44). When Masciola was hospitalized again in October and November 2009,

---

[10] The record provided to the ALJ includes medical records to November 13, 2009, four days prior to the hearing. (R. at 736).

[11] The record reflects that Dr. Cruz treated Masciola during five visits in 2007 and six visits in 2009.

Dr. Ahmari assessed him with mania and suicidal ideation, and a GAF of 20-30. [12] (*Id.* at 710-11). Those opinions should likewise be considered and weighed by the ALJ. While each hospitalization provided an opportunity only to examine Masciola during a crisis, which examination results would not be found necessarily consistent with his state once the crises had passed, those periods are a significant part of Masciola's medical history and yet were given no discernable consideration by the ALJ in reaching her determination.

The medical evidence overall demonstrated that Masciola experienced mania multiple times per year, relapsed with his substance abuse, and returned to the hospital for hallucinatory periods and drug overdose multiple times. (R. at 636 (admitted for detox on 12/4/03), 464-68 (admitted for hallucinations, suicidality and depression on 5/20/05), 497-99 (admitted for depression and suicidality on 9/24/05), 510-12 (admitted for depression on 1/4/07), 412-13 (admitted for drug overdose and relapse with cocaine on 11/21/07), 708-12 (admitted for mania and depression with suicidal ideation on 10/12/09), 721-34 (admitted for "acute depression with suicidal ideation" 10/23/09)).

### 3. The ALJ's Analysis of the Medical Evidence in Analyzing the Listing and Masciola's RFC

In coming to her conclusions regarding whether Masciola's mental impairment met the paragraph "B" criteria of listings 12.04 and 12.09, the ALJ cited: (1) testimony from the hearing; (2) Masciola's August 2008 Function Report; (3) an August

---

[12] A GAF of 20-30 is described at footnotes 6 and 8.

2008 Psychiatric Assessment completed by treating physician Dr. Dwivedi; (4) and the State psychological consultant's report, dated May 14, 2008. (*Id*.). The ALJ failed to discuss the wealth of other treating physicians' opinions in the record, or to explain why she disregarded them. Instead, she briefly noted a few scattered medical records, and then, without explanation, adopted the DDS psychologist's evaluation. (*Id*. at 68).

It is well-established that an ALJ cannot discuss only those portions of the records that support her opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence.")(citations omitted). Critically, when "determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Scott*, 647 F.3d at 739. "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Accordingly, "[a]n ALJ who chooses to reject a treating physician's opinion must provide a sound explanation for the rejection." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2); other citations omitted).

The courts have discouraged ALJs from simply adopting the DDS psychologist's evaluation, without explaining why his opinion carried such great weight, stating that, a "contradictory opinion of a non-examining physician does not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion. *Gudgel*, 345 F.3d at 470; *Oakes v. Astrue*, 258 F. Appx. 38, 44 (7th Cir. 2007). Indeed, "the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." Social Security Ruling ("SSR")[13] 96-6p. Thus, the agency consultant's opinion can be given weight only if it is "supported by evidence in the case record." (*Id.*) In determining the weight to afford the non-examining consultant's opinion, the ALJ must consider: (1) whether the opinion is supported by the medical evidence, including evidence received by the ALJ that was not before the state agency; (2) whether the opinion is consistent with the record as a whole, including other medical opinions; (3) any explanations provided by the agency consultants; and (4) the agency consultant's specialization, if any. *See id.; accord Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the

---

[13] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citation and quotation omitted); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (emphasis in original).

case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances.") But, generally, "[m]ore weight is given to the opinions of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel*, 345 F.3d at 470. Significantly, "if an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature and extent of the treatment relationship, frequency of examination, the physician's specialty, the type of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740 (citations omitted).

In this case, the ALJ relied on a report from a nontreating psychologist prepared a year before the hearing to find that Masciola's daily functioning was only mildly limited. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citations omitted) ("[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."). One concern with the opinion rendered by that psychologist's report is that it relied on medical records only until February 2008, and did not consider the Annual Adult Clinical Evaluation by Dr. Dwivedi, conducted in June 2008 (R. at 581-84), which noted frequent decreased concentration, frequent hallucinations, persistent impulsivity and a GAF of 35. He also was not pro-

vided the records for any of Masciola's three 2009 hospitalizations.[14] (R. at 705-34).

Dr. Fullilove also was not provided Dr. Cruz's evaluations from 2009, including his opinions from four days prior to the hearing. (R. at 736-48). Further, a Medical Evaluation prepared for DDS, by Tyrone Hollerauer, Psy.D., (R. at 461-63), did consider Dr. Dwivedi's June 2008 DDS evaluation, but was never referenced by the ALJ.

In coming to her conclusion regarding Masciola's impairment, the ALJ acknowledged only an isolated few of the treating physicians' opinions; she noted agreement between Dr. Dwivedi and the claimant regarding Masciola's anger, and she cited one medical assessment from March 2008 regarding Masciola's memory and attention. (R. at 68). The remainder of the ALJ's discussion regarding treating physicians' opinions was limited to the ALJ's evaluation of Masciola's credibility. (R. at 70-71).

The ALJ's lack of an explanation for her reliance upon the DDS psychologist, and, indeed, failure to address contradictory information from a multitude of treating physicians' evaluations and assessments, is legally insufficient and is not supported by substantial evidence. The ALJ failed to explain the weight she afforded the treating physicians' opinions. *Punzio*, 630 F.3d at 710 ("[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."); 20 C.F.R. § 404.1527(d)(2). Significantly, she failed to explicitly address the

---

[14] It is unclear if Dr. Fullilove reviewed the medical records for Masciola's hospitalization in Fall 2007.

required checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which essentially "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the non-examining physician's report contradicts the treating physician's opinions, "the checklist comes into play"). The checklist of factors weigh heavily in favor of the treating physicians in this case. Dr. Dwivedi treated Masciola between November 2007 and September 2008, evaluating him over eight clinic visits (R. at 317-24, 457-59, 557-603), and Dr. Cruz treated Masciola between March 2007 and November 2009, evaluating him during twelve clinic visits (*id.* at 342-49, 736-48). Dr. Dwivedi's and Dr. Cruz's psychiatric opinions and notations regarding Masciola's presentation during his clinic visits reflect consistent psychiatric evaluations of the claimant by long-term treating physicians. *See Scott*, 647 F.3d at 740 (discussing checklist factors).

In addition to invalidating the ALJ's listing analysis, plaintiff asserts that the ALJ's failure to examine all the medical evidence also compromised her analysis of Masciola's RFC. In this analysis (R. at 69-71), the ALJ again adopted the DDS psychologist's report without discussion or analysis, stating that it "adequately reflects the medical record available to the consultant, and it is consistent with the medical evidence added to the record at the hearing level" (*id.* at 71). The records provided to the consultant were only partial, and his opinion did not comport with the medical records that came after his report was issued. Additionally, the ALJ failed to provide any analysis of the treating physicians' opinions, which contradicted the

consultant's opinions; accordingly, the RFC analysis is legally insufficient. *See Bauer*, 532 F.3d at 608 (finding that the well-supported opinions of two long-term treating physicians who specialized in psychiatric disorders could not be set aside for the conflicting view of the consultant, whose specialty was unknown to the court). On remand, the ALJ shall first reevaluate the weight to be afforded Drs. Cruz's, Dwivedi's, Amer's, and Ahmari's assessments and notes, and all of Masciola's medical records from his hospitalizations, taking into account the checklist factors. The ALJ shall then reevaluate Plaintiff's impairments, assessing whether they meet the listings in accordance with 12.04 and 12.09. If the ALJ finds that Plaintiff does not meet a listing, then, considering the full range of medical evidence in the record, she shall reevaluate Masciola's RFC.[15] *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the ALJ has any questions about whether to give controlling weight to those opinions, she is encouraged to re-contact the treating physicians, order a consultative examination, or seek the assistance of a medical expert. See SSR 96-5p; 20 C.F.R. §§ 404.1517, 416.917, 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ thought he needed to know the basis of medical opinions in order to evaluate them, he had a duty to conduct an

---

[15] The ALJ must also consider whether Masciola's dependence on supportive housing affects the 12.04 analysis; at the time of the hearing, he had been living at DuPage County's Pads supportive housing program for 2 years. His case manager, Courtney Boyda, testified that Masciola joined the PADS program in July 2007. (R. at 37).

appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them.") (citation omitted).[16]

## B. The ALJ's Improper Consideration of Masciola's credibility

Plaintiff contends that the ALJ's credibility finding did not conform to SSR 96-7p. (Pl. Mot. 12-13). The Commissioner responds that plaintiff's contention is more accurately painted as a challenge to "the ALJ's weighing of the evidence," and states that the ALJ need not and cannot determine the functional severity of the claimant's mental limitations after steps 2 and 3 of the SSA's five-step disability analysis. (Dft. Mot. at 11). As stated above, the ALJ's analysis regarding Masciola's RFC was legally insufficient due to her failure to consider all the of medical evidence. Her RFC analysis, however, mainly focused on Masciola's credibility.

When she assesses credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano*, 556 F.3d at 562; *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2) (other citations omitted)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve

---

[16] Because the Court is remanding this matter for the ALJ to properly evaluate the opinions of the treating physicians, the Court need not address plaintiff's claims that the ALJ failed to analyze listings 12.04 and 12.09, including that the ALJ failed to adequately review the evidence under 12.04(C). The Court also declines to address plaintiff's claim that the ALJ considered past work that is nonsubstantial gainful activity.

[the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Accord Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. Longitudinal medical records—whether from a single physician or multiple physicians at one medical facility—can be especially illuminating because they can provide, for example, longer term records regarding medications tried and their success or failure at treating symptoms, a history of symptom complaint, and "precipitating or aggravating factors, frequency and duration, course over time." SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009). However, credibility determinations "based on errors of fact or logic" are not binding on the court. *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). In analyzing an ALJ's opinion for such error, we give the opinion a

"commonsensical reading rather than nitpicking at it." *Castile v. Astrue*, 617 F.3d
923, 929 (7th Cir. 2010) (affirming Commissioner's denial of benefits).

In her decision, the ALJ made the following credibility determination:

> After careful consideration of the evidence, the undersigned finds that
> the claimant is not persuasive, the objective evidence not supporting
> the extent of the claimant's alleged inability to perform work. For ex-
> ample, the claimant does volunteer work at his church, per claimant,
> "stuffing envelopes." He also reported that he supervised "young volun-
> teers" during kitchen cleanup at the church.
>
> Despite losing his driver's license, the claimant is still capable of get-
> ting around by riding his bicycle. He reported a dislike/distrust of oth-
> ers, but he still accepts rides offered him so he can attend church and
> attend Alcoholics Anonymous meetings.
>
> The record shows the claimant having a long history of non-compliance
> with treatment. In May 2009, the claimant was discharged from re-
> ceiving treatment through the DuPage County Health Department be-
> cause he had not kept appointments, failed to appear during home-
> visit appointments, had not provided his care providers requested in-
> formation, and had not made any progress toward the goals/objective
> [*sic*] presented in his treatment plan.
>
> The claimant testified that he has not used cocaine since November
> 2008. However in October 2009, the claimant admitted to using cocaine
> a few weeks earlier.
>
> \*     \*     \*
>
> The undersigned finds that the claimant's allegations regarding the
> limiting effects and the severity of the symptoms of his impairments
> are only partially credible. The claimant retains the ability to work at
> all exertional levels and the residual functional capacity, as restricted
> by the nonexertional limitations presented above, is justified. This
> finding was made after examination of the claimant's medical record as
> a whole, consideration of the factors presented at 20 C.F.R.
> § 404.1529(c)(3) and Social Security Ruling 96-7p, and of the claimant's
> testimony.

(R. at 70-71) (citations omitted). The reasons provided by the ALJ for rejecting his
credibility are not legally sufficient or supported by substantial evidence.

First, the ALJ failed to discuss the SSR-96-7p factors. "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations. . . and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p; *accord Steele*, 290 F.3d at 941-42 ("According to Social Security Ruling 96-7p, . . . the evaluation must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.'. . . Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed."). The ALJ's failure to analyze these factors warrants reversal. *See Villano*, 556 F.3d at 562 (because "the ALJ did not analyze the factors required under SSR 96-7p," he "failed to build a logical bridge between the evidence and his conclusion that [claimant's] testimony was not credible").

The ALJ discredited Masciola's credibility in part because: (1) claimant does volunteer work at his church, "stuffing envelopes," and because "he supervised 'young volunteers' during kitchen cleanup at the church;" (2) despite losing his driver's license, he can still get around by bicycle; (3) despite Masciola, in the ALJ's words, claiming "a dislike/distrusts of others," he accepts rides to church and to AA meetings; and (4) Masciola has a long history of noncompliance with treatment. (R. at 70-71).[17]

---

[17] The ALJ also based her credibility determination on a finding that Masciola testified that he had not used cocaine since November 2008, when the medical records reflect that he

## 1. Volunteer Church Work

Masciola testified that his occasional volunteer work at his church amounted to "a couple of hours" (R. at 24); on occasion, he was unable to do it more than half of the times asked because of a lack of motivation (*id*. at 25). Sometimes he would voluntarily clean at the church when he was in a manic phase, and then "burn out" from it in a few hours, and other times he would fall into depression while volunteering and have to leave early. (*Id*. at 26).

Masciola's testimony about his church volunteering, as an example of his daily activities, demonstrates activity he is capable of as long as he is provided great flexibility and spontaneity. He testified that sometimes when volunteering at the church he leaves early because he "burn[s] out" or he is not getting along with people. (R. at 26-27). "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating [his] credibility, SSR 96-7p, at *3, this must be done with care." *Roddy v. Astrue*, 705 F3d 631, 639 (7th Cir. 2013). Indeed, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id*. "The critical differences between activities of daily living and activities in a full-time job are that a person has

---

had used it "a few weeks earlier," apparently a reference to Masciola's statement upon admission to Linden Oaks Hospital that he had used cocaine a few weeks prior to that date, October 13, 2009. (R. at 710). Because the Court finds this basis for questioning claimant's credibility to be based on substantial evidence, no further discussion on this topic is required.

more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). Here, the ALJ does not explain how any of Plaintiff's daily activities equates to the ability to work full-time outside the home. In fact, the claimant's testimony about his inconsistent and unreliable church work appears to demonstrate an *inability* to work full-time outside of the home. The ALJ's use of the church work as an example is illogical. *See Jelinek*, 662 F.3d at 812 ("[W]e are hard-pressed to understand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations.").

### 2. *Getting Around by Bicycle*

In support of her finding that Masciola "is not persuasive," the ALJ cites that "[d]espite losing his driver's license, the claimant is still capable of getting around by riding his bicycle." (R. at 70). The ALJ provided no explanation for why Masciola's ability to get around by bicycle indicated a lack of credibility, and the Court, unable to devise one on its own, is required in any case to limit its review to any rationale offered by the ALJ. *See Steele,* 290 F.3d at 941 (*citing SEC v. Chenery Corp.*, 318 U.S. 80, 90-93 (1943)). The court finds this reason to be based on an error of logic.

### 3. Dislike/Distrust of Others

As evidence of the claimant's lack of credibility, the ALJ states that Masciola "reported a dislike/distrust of others," and yet he accepts rides to church and to AA meetings. (R. at 70). The ALJ offered no record citation for Masciola's statement, but the Court notes that Masciola's Function Report denotes his problems getting along with others. (*Id.* at 223). The Court also notes hearing testimony that appears to address this issue directly. At the hearing, the ALJ engaged in the following colloquy with Masciola's case worker, Courtney Boyda:

| | |
|---|---|
| ALJ: | In your opinion, could he handle himself without confrontation, without feeling that the superiors were criticizing him or directing him in a work situation for 40 hours a week? |
| Boyda: | No. |
| ALJ: | Five days a week, eight hours a day? |
| Boyda: | No, Dominic [Masciola] might be able to handle it for one day and that's about it. |
| ALJ: | That would be about it. |
| Boyda: | When he initially came into the program, he had a kind of spotted history of working and what not. And during that time, again, when I talked to him I said what was the main reason why were you leaving these jobs, what happened. And again his response was always "this person," you know, "I just couldn't handle how they started talking to me" or it was just too much pressure for him, so. |

(*Id.* at 46-48). Boyda also testified that Masciola is suspicious of "systems and government," but not of "his immediate people who are kind of closer to him." (*Id.* at 47). The ALJ is required to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists

and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 823 (citation omitted) (quoting SSR 96-7p); *see* 20 C.F.R. § 404.1529(c). Here it appears that the ALJ failed to consider all the evidence provided on this point, and in doing so came to a conclusion not logically supported by the evidence before her. Accepting a ride to church or to AA from a friend or family member in no way demonstrates a lack of credibility regarding Masciola's claims about an inability to work under and take direction from a supervisor.

### 4. History of Noncompliance

The ALJ states, again without explanation, that the claimant has a "long history of non-compliance with treatment," citing three medical records. (R. at 70). One of the cited records is from January 2007, and does note noncompliance with medication and aftercare (*Id.*). The second cite is to two separate medical records noting: (a) a two week follow-up visit with Dr. Cruz in February 2009, which record does not indicate noncompliance (*id.* at 740); and (b) another follow-up visit with Dr. Cruz, which indicates that Masciola ran out of medication (*id.* at 739). The ALJ did not explore why Masciola ran out of medication, however. *See* SSR 96-7p (The ALJ "may need to . . . question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility."); *accord Roddy*, 705 F.3d at 638-39 ("The agency requires ALJs to inquire about a

claimant's reasons for not seeking treatment."); *Jelinek*, 662 F.3d at 814 ("ALJ's assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference.") The ALJ accordingly cannot rely on Masciola's having run out medications as a basis for a lack of credibility without further examination of the reasons.

The ALJ's last citation relates to Masciola's care being terminated in May 2009 for his failure to show at appointments. (R. at 603). Even if missing appointments since January 2009 demonstrates a "long history of non-compliance with treatment," it is unclear how this history denigrates Masciola's credibility regarding his ability to work. The Seventh Circuit has recognized that "mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and depressive phases of the disease (citations omitted)), may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) (vacating and finding that the ALJ did not provide a rational basis for the denial of disability benefits to plaintiff). As such, Masciola's diagnosed illness may itself prevent his consistency of taking medication and getting treatment. Yet, the ALJ did not consider this possibility, or discuss its effect on his credibility.

Significantly, even when Masciola did take his medication as prescribed, he struggled with his bipolar disorder. As the Seventh Circuit has acknowledged, "[t]here can be a great distance between a patient who responds to treatment and

one who is able to enter the workforce, and that difference is borne out in [the treating physician's] treatment notes." *Scott*, 647 F.3d at 739-40. Masciola's psychiatrists changed his medication dosages and added or subtracted medications wholesale depending on the drug's effect at the time, and its side effects, and depending on his mental state—whether he was manic, depressed or in a more even phase. (R. at 47-48, and throughout the medical records). On remand, the ALJ should consider Masciola's responses to treatment and hospitalizations even when in treatment, and the consequent limitations on Masciola's ability to work.

## C. Summary

In sum, the ALJ has failed to build an "accurate and logical bridge from the evidence to [her] conclusion." *Young,* 362 F.3d at 1002. On remand, the ALJ shall review all Masciola's medical records, including all treating physicians' opinions, and must either accord those opinions controlling weight, or explain why she is not, explicitly addressing the statutorily required factors. The ALJ shall return to step 2 of the five-step process, and shall reevaluate Masciola's impairments, assessing whether they meet the listings in accordance with 12.04 and 12.09. The ALJ shall also reassess Masciola's credibility with due regard for the full range of medical evidence, and reevaluate his RFC, considering all of the evidence of record. The ALJ shall then explain the basis of her findings in accordance with the applicable regulations and ruling, before completing the five-step process.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment [26] is **GRANTED**, and Defendant's Motion for Summary Judgment [28] is **DENIED**. Pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: July 22, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge